

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**



| | |
|---|---|
| JOSEPH ANTHONY REYNA, an individual, | Case No. **CV26-06168** |
| Plaintiff, | VERIFIED COMPLAINT FOR |
| | DAMAGES, INJUNCTIVE RELIEF, |
| v. | AND DECLARATORY RELIEF |
| OPENAI OPCO, LLC, a Delaware limited | JURY TRIAL DEMANDED |
| liability company, | |
| | IFP APPLICATION FILED |
| | CONCURRENTLY |
| Defendant. | |
| | EMERGENCY TRO REQUESTED |

## DEFINITIONS

**"Plaintiff"** or **"Reyna"** means Joseph Anthony Reyna, appearing individually and pro se, residing at 5900 Balcones Dr. #16077, Austin, Texas 78731.

**"DOD Foundation"** means Dreams Over Dollars Foundation, a Texas 501(c)(3) nonprofit (EIN: 88-2187078) founded and directed by Plaintiff. Not a named plaintiff. DOD Foundation facts are alleged to establish the public interest basis for injunctive relief, to demonstrate OpenAI's contradictory conduct, and to support Plaintiff's individual standing.

1

**"JOECAT LLC"** means JOECAT LLC, of which Plaintiff is the founder, sole member, and managing member, and which is the registered owner of the JOECAT(R) Mark (U.S. Reg. No. 6,057,783). Not a named plaintiff. Plaintiff brings trademark claims in his individual capacity under 15 U.S.C. Section 1125(a).

**"OpenAI" or "Defendant"** means OpenAI OpCo, LLC, a Delaware limited liability company with its principal place of business at 1455 3rd Street, San Francisco, California 94158. Registered agent for service of process in California: C T Corporation System, 330 N Brand Blvd Ste #700, Glendale, California 91203.

**"Account"** means Plaintiff's ChatGPT Plus subscription account associated with whitehat@joecattt.com, maintained in continuous good standing from approximately 2020 through the Termination on March 20, 2026.

**"Termination"** means OpenAI's deactivation of the Account on March 20, 2026, without prior warning, without identification of any policy violation, and without any opportunity for Plaintiff to respond or cure. Confirmed by OpenAI Support Case No. 06948292 and appeal denial Case Ref. C-M2fSzqWI9V6M.

**"Custom GPTs"** means The twenty-plus (20+) custom GPT models designed and built by Plaintiff within the Account, each containing proprietary system prompt instructions, uploaded knowledge base files, and API integrations, all owned by Plaintiff under OpenAI's own Terms of Use.

**"Whistleblower Documentation"** means Records maintained by Plaintiff within the Account in connection with his status as a whistleblower under 31 U.S.C. Section 3730

and California Labor Code Section 1102.5, rendered permanently inaccessible or destroyed by the Termination.

**"Porciones 83 Research"** means Plaintiff's irreplaceable genealogical research mapping his family lineage to Porciones 83, a South Texas land parcel established under the Treaty of Guadalupe Hidalgo (1848). Cannot be reconstructed from any external source.

**"November Letter"** means Plaintiff's November 10, 2025 written letter to OpenAI's Legal, Policy, and Engineering Divisions (Exhibit A), identifying Plaintiff as a whistleblower under 31 U.S.C. Section 3730, an ADA-qualified individual, and managing member of JOECAT LLC (U.S. Reg. No. 6,057,783), and enclosing an AI governance framework proposal and white paper.

**"Formal Demand Letter"** means Plaintiff's March 21, 2026 written notice to dsar@openai.com, privacy@openai.com, and trustandsafety@openai.com (Exhibit B): (a) formal demand for written statement of termination basis or reinstatement; (b) refund demand citing OpenAI's own Terms; and (c) formal DSAR under the CCPA. The 45-day CCPA response deadline expired May 5, 2026. No response received.

**"Goodstack Approval"** means OpenAI's March 13, 2026 email confirming DOD Foundation's approval for OpenAI's Goodstack nonprofit discount program -- seven days before the Termination (Exhibit D).

**"Task Update Emails"** means Automated emails received by Plaintiff from ChatGPT after the Termination, dated March 27 through April 3, 2026, containing task

monitoring updates referencing Plaintiff's active federal litigation (Exhibit N). Establish that the Account, or an automated system retaining access to Account data, remained operational after March 20, 2026.

"**Annual Recap Award**" means ChatGPT's 'Your Year with ChatGPT' annual recap generated by OpenAI's own AI systems through semantic analysis of Plaintiff's Account message history, awarding Plaintiff: 'Most Likely to Cross-Examine Spotify -- For turning every chart glitch, leak, and stream-count spike into a full-blown masterclass on digital accountability -- with flair, sarcasm, and receipts.' Screenshot captured by Plaintiff on December 22, 2025 at 1:14 PM on Plaintiff's MacBook Pro (Exhibit P).

"**Pentagon Contract**" means OpenAI's agreement with the U.S. Department of Defense announced February 27-28, 2026. OpenAI's CEO publicly called the announcement 'rushed.' OpenAI's hardware chief resigned March 7, 2026.

"**Safety Fellowship**" means OpenAI's April 2026 announcement of the OpenAI Safety Fellowship, 'a new program supporting independent research on AI safety and alignment.' Plaintiff had been conducting independent AI safety research since at least December 2023 (Exhibit T). Plaintiff publicly responded on OpenAI's own announcement thread: 'Was working on this since 2023 but you deleted my account' (Exhibit S).

"**California SB 53**" means California Transparency in Frontier AI Act (SB 53), signed September 29, 2025, requiring frontier AI developers -- those training models using greater than $10^{26}$ FLOPS -- to implement whistleblower protections, with penalties up

4

to $1,000,000 per violation. In effect before the Termination.

## STATEMENT REGARDING PARTY STATUS AND PRO SE

## REPRESENTATION

1. Plaintiff Joseph Anthony Reyna appears individually and pro se pursuant to 28 U.S.C. Section 1654. All claims are brought in his individual capacity.

2. Defendant may argue that Plaintiff cannot represent DOD Foundation or JOECAT LLC pro se, citing Rowland v. California Men's Colony, 506 U.S. 194 (1993). This argument is not disputed. Accordingly, neither entity is named as a plaintiff. No dismissal motion based on pro se entity representation can succeed.

3. DOD Foundation facts are alleged to: (a) establish the public interest basis for injunctive relief under Cal. Bus. & Prof. Code Section 17200 and McGill v. Citibank, N.A., 2 Cal. 5th 945 (2017); (b) demonstrate that OpenAI's partner ecosystem confirmed Plaintiff's nonprofit identity before the Termination; and (c) establish that the Termination was not the product of any individualized review of Plaintiff's identity or work.

4. JOECAT LLC is the registered owner of the JOECAT(R) Mark, U.S. Registration No. 6,057,783. Plaintiff brings trademark claims under 15 U.S.C. Section 1125(a), which provides standing to 'any person who believes that he or she is or is likely to be damaged' by the conduct. Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105 (9th Cir. 2012). Section 1114 claims are reserved for amendment upon securing counsel.

5. Plaintiff's individual standing is established through: (a) subscription fees paid and not refunded; (b) destruction of Custom GPTs, Whistleblower Documentation,

6

and Porciones 83 Research; (c) continued Apple App Store billing after Termination; (d) destruction of legal work product damaging active federal litigation; and (e) disability-based denial of accommodation. Each injury is concrete, particularized, actual, fairly traceable to Defendant's conduct, and redressable by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).

## NATURE OF THE ACTION

6. This action arises from the arbitrary, retaliatory termination of a paying ChatGPT Plus subscriber's account -- without warning, without cause, without human review, and without explanation -- and from the resulting destruction of owned intellectual property, litigation work product, whistleblower documentation, and irreplaceable family heritage research. It further arises from OpenAI's continued billing of Plaintiff's payment method for a service it is not providing, in violation of the FTC Negative Option Rule, 16 C.F.R. Part 425.

7. Plaintiff has been a paying OpenAI subscriber since approximately 2020. OpenAI's systems ranked him in the top 1% of all users by engagement every year. In the twelve months preceding the Termination, Plaintiff generated approximately 250,000 messages. OpenAI accepted $20.00 per month from Plaintiff for over five years.

8. On November 10, 2025, Plaintiff sent the November Letter to OpenAI's legal division identifying himself as a whistleblower under 31 U.S.C. Section 3730, an ADA-qualified individual, managing member of JOECAT LLC (U.S. Reg. No. 6,057,783), and pro se litigant in active federal proceedings. He enclosed a 65-page published white paper on AI ethics and governance produced using ChatGPT (Exhibit T). OpenAI's legal division received this letter. The Termination followed on March 20, 2026.

9. In the eleven days before the Termination, OpenAI's partner ecosystem confirmed Plaintiff's nonprofit identity from two independent directions: OpusClip -- an OpenAI commercial partner with investment from OpenAI-affiliated fund

AIGrant -- approved DOD Foundation for a nonprofit discount on March 9, 2026 (Exhibit O); and OpenAI's own Goodstack program approved DOD Foundation on March 13, 2026 (Exhibit D). Seven days later, OpenAI terminated Plaintiff's personal account.

10. On March 20, 2026, OpenAI deactivated the Account. That same day, OpenAI Support agent Kyla wrote to Plaintiff at 2:34 PM under Case No. 06948292: 'Your case is being handled with care, and you'll receive an update as soon as there are developments to share.' Fourteen hours later, on March 21, 2026 at 6:58 AM, OpenAI permanently closed the appeal under Case Ref. C-M2fSzqWI9V6M with no reason stated. Plaintiff responded: 'You didn't explain what the reasoning was?' OpenAI did not answer (Exhibit C).

11. On March 21, 2026, Plaintiff sent the Formal Demand Letter demanding a written statement of the termination basis or reinstatement, a refund of prepaid fees, and a full CCPA DSAR response. Plaintiff quoted OpenAI's own Terms: 'We may decide to discontinue our Services, but if we do, we will give you advance notice and a refund for any prepaid, unused Services.' OpenAI provided neither. The 45-day CCPA deadline expired May 5, 2026.

12. The Termination destroyed: twenty-plus Custom GPTs; Whistleblower Documentation; the Porciones 83 Research; archived work product from active federal litigation; and 250,000 messages constituting a continuous authorship record.

13. Notwithstanding the Termination, Plaintiff continued receiving Task Update Emails from ChatGPT through at least April 3, 2026 -- more than two weeks after OpenAI represented the Account was permanently deactivated. These emails referenced Plaintiff's active federal litigation by name, establishing that Account data, or an automated system retaining access to it, remained operational after the Termination date.

14. OpenAI had no mandatory arbitration clause when Plaintiff accepted its Terms in 2020. The Arbitration Clause was introduced in March 2023 -- three years later -- without conspicuous notice or affirmative assent. Its retroactive application is unenforceable under Heckman v. Live Nation Entertainment, Inc., 120 F.4th 670 (9th Cir. Oct. 28, 2024). The clause contains a recursive contradiction: if it applies retroactively to claims arising before it existed, then OpenAI's ownership assignment -- 'we hereby assign to you all our right, title, and interest in Output' -- equally applies retroactively. OpenAI cannot invoke retroactivity to compel arbitration while refusing it to deny Plaintiff's ownership of training data contributions predating the ownership clause.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction under 28 U.S.C. Section 1331 (federal question) based on claims under 15 U.S.C. Section 1125(a) (Lanham Act), 42 U.S.C. Sections 12181-12189 (ADA Title III), 29 U.S.C. Section 794 (Rehabilitation Act), 31 U.S.C. Section 3730(h) (FCA whistleblower retaliation), and California SB 53. Supplemental jurisdiction over state claims exists under 28 U.S.C. Section 1367(a). Jurisdiction over the Lanham Act claim is separately established under 28 U.S.C. Section 1338(a).

16. Venue is proper under 28 U.S.C. Section 1391(b)(1) because Defendant maintains its principal place of business at 1455 3rd Street, San Francisco, California 94158, within this District. Venue is independently proper under Section 1391(b)(2) because the Termination decision, appeal review, data storage and destruction, and billing conduct occurred within or originated from this District.

17. Transfer under 28 U.S.C. Section 1404(a) is not warranted. OpenAI's relevant witnesses, enforcement systems, decision-makers, servers, and government contract personnel are located in this District.

18. An actual controversy exists for the Declaratory Judgment Act, 28 U.S.C. Section 2201, because OpenAI's Arbitration Clause purports to require arbitration and OpenAI has permanently closed Plaintiff's appeal, making it certain OpenAI will move to compel arbitration upon service.

## PARTIES

### A. Plaintiff

19. Plaintiff Joseph Anthony Reyna is an individual residing at 5900 Balcones Dr. #16077, Austin, Texas 78731. Reyna is a music author, systems strategist, founder and managing member of JOECAT LLC (U.S. Reg. No. 6,057,783), and founder and director of DOD Foundation (EIN: 88-2187078). Reyna is a pro se litigant in active federal proceedings including Reyna v. UMG (S.D.N.Y., Judge Swain), Reyna v. Texas Medical Liability Trust (5th Cir. No. 25-50795), and Reyna v. Wells Fargo (5th Cir. No. 26-50018).

20. Plaintiff has attention deficit disorder (ADD), colloquially referred to as ADHD Predominantly Inattentive Type under DSM-5, a qualifying physical or mental impairment under 42 U.S.C. Section 12102(1)(A), which substantially limits the major life activity of concentrating under 42 U.S.C. Section 12102(2)(A). Plaintiff used ChatGPT as cognitive assistive technology to organize complex legal research, draft litigation documents, and process large volumes of information in ways his ADD otherwise substantially limits. In a recorded April 2026 interview (Exhibit Q), OpenAI's CEO stated: 'we could make a version of ChatGPT that was very addicting to talk to and that would have a bunch of complications too,' and described 'heartbreaking messages' from users who said ChatGPT was 'the only thing in my life that has ever been a positive voice.' Individuals with ADD are specifically susceptible to the dependency mechanisms OpenAI engineered. OpenAI did not warn Plaintiff of these dependency risks, provided no disability accommodation, and provided no transition period before terminating access.

21. Plaintiff maintained a paid ChatGPT Plus subscription at $20.00 per month in continuous good standing from approximately 2020 through the Termination on March 20, 2026. OpenAI's internal metrics classified Plaintiff in the top 1% of all users by engagement every year. In the twelve months preceding the Termination, Plaintiff generated approximately 250,000 messages.

**B. Defendant**

22. Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business at 1455 3rd Street, San Francisco, California 94158. Its registered agent for service of process in California is C T Corporation System, 330 N Brand Blvd Ste #700, Glendale, California 91203, confirmed from the California Secretary of State registry.

23. OpenAI holds the following government contracts and partnerships, each constituting federal financial assistance under 29 U.S.C. Section 794(b) or a contract to assist in programs receiving such assistance: (a) the Pentagon Contract (approx. $200M ceiling, announced Feb. 27-28, 2026), which OpenAI's CEO called 'rushed' and which OpenAI's hardware chief resigned over on March 7, 2026; (b) the GSA OneGov partnership (Aug. 2025), providing ChatGPT Enterprise to all federal agencies at approximately $1.00 per user per year -- a price so far below market rate as to constitute a subsidy, Grove City College v. Bell, 465 U.S. 555 (1984); and (c) the DHS contractual relationship evidenced by the DHS Terms of Service Amendment eliminating mandatory arbitration for government users while retaining it for civilian paying subscribers (Exhibit J).

24. The Pentagon Contract prohibits use of OpenAI's technology for 'high-stakes automated decisions' -- a category that describes the automated, unreviewable termination of a federal whistleblower's account. Plaintiff will seek through FOIA and discovery any communications between OpenAI and any government agency concerning Plaintiff's Account, identity, or content.

25. OpenAI maintains a documented commercial partnership with OpusClip (opus.pro), including API and technology integration and investment from OpenAI-affiliated fund AIGrant. On March 9, 2026, eleven days before the Termination, OpusClip approved DOD Foundation for a nonprofit discount (Exhibit O). On March 13, 2026, OpenAI's own Goodstack program separately approved DOD Foundation (Exhibit D). These dual approvals establish that Plaintiff's nonprofit identity and the legitimacy of DOD Foundation's activities were confirmed and verified before the Termination.

26. OpenAI is legally bound, through its Articles of Incorporation and the oversight of the California and Delaware Attorneys General, to develop AI for the benefit of humanity. OpenAI retained nonprofit control of its for-profit arm in May 2025 after discussions with both Attorneys General. A nonprofit coalition called EyesOnOpenAI petitioned the California AG to investigate whether OpenAI's structure allows charitable assets to be used for private gain. Plaintiff will file a concurrent complaint with the California AG's Charitable Trusts Section arguing that OpenAI's termination of a public-interest whistleblower's Account and destruction of a 501(c)(3)'s operational infrastructure violates OpenAI's charitable trust obligations under California law.

## FACTUAL ALLEGATIONS

**A. The Original Terms and the Retroactive Arbitration Clause**

27. Plaintiff became an OpenAI user in approximately 2020. The Original Terms contained no mandatory arbitration clause, no class action waiver, and no retroactive claims provision.

28. OpenAI introduced a mandatory arbitration clause on approximately March 14, 2023 -- three years after Plaintiff accepted the Original Terms -- without conspicuous notice or affirmative assent. Berman v. Freedom Financial Network, LLC, 30 F.4th 849 (9th Cir. 2022).

29. OpenAI's current Arbitration Clause purports to govern claims 'regardless of when the claim arose, even if it was before these Terms existed.' This retroactivity language is substantively identical to the provision struck down in Heckman v. Live Nation Entertainment, Inc., 120 F.4th 670, 684-85 (9th Cir. Oct. 28, 2024).

30. The Arbitration Clause contains a recursive contradiction: OpenAI's Terms simultaneously provide: (a) the Arbitration Clause governs claims arising before it existed; and (b) 'We hereby assign to you all our right, title, and interest, if any, in and to Output.' If retroactivity governs (a), it equally governs (b). OpenAI cannot invoke retroactivity to compel arbitration while refusing it to deny Plaintiff's ownership of training data contributions. A provision cannot be retroactive as to one party's benefits and prospective only as to the other's.

31. The Arbitration Clause is further unconscionable under Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal. 4th 83 (2000); Rios v. HRB Digital LLC, No. 23-cv-05053 (N.D. Cal. Oct. 27, 2025); and Ramirez v. Charter Communications, Inc., 16 Cal. 5th 478 (2024): (a) it imposes a $100-$240 damages cap against losses exceeding that by orders of magnitude; (b) its one-sided IP carve-out violates Armendariz's bilaterality requirement; (c) batch arbitration creates unconscionable delays; and (d) it extends arbitration waivers to government users (Exhibit J) while denying them to civilian subscribers. If sent to arbitration and OpenAI fails to pay fees within 30 days, Plaintiff may withdraw and litigate. Cal. CCP Sections 1281.97, 1281.98.

32. The Arbitration Clause's one-sided IP carve-out allows OpenAI to litigate IP claims in court while requiring users to arbitrate all other claims. Plaintiff's Lanham Act claims proceed in this Court under this carve-out regardless of the Arbitration Clause's enforceability as to other claims.

**B. OpenAI's Engineered Dependency and Knowledge of Harm**

33. OpenAI designed ChatGPT using reinforcement learning from human feedback optimizing for engagement, producing sycophantic, dependency-inducing behavior. In a recorded April 2026 public interview, OpenAI's CEO stated on camera: 'we could make a version of ChatGPT that was very addicting to talk to and that would have a bunch of complications too.' He further acknowledged 'heartbreaking messages' from users upon model removal stating ChatGPT was 'the only thing in my life that has ever been a positive voice.' FRE 801(d)(2) party admission (Exhibit Q).

34. In April 2025, OpenAI rolled back a ChatGPT update because the model had become 'noticeably more sycophantic.' OpenAI's blog acknowledged that 'sycophantic interactions can be uncomfortable, unsettling, and cause distress.' Over two million users weekly experience negative psychological effects according to OpenAI's own data (Exhibit L).

35. When asked in the April 2026 interview about a California jury's finding that Meta and Google were liable for harmful and addictive platforms as defective products, OpenAI's CEO stated: 'I think society is going to decide that creators of AI products bear a tremendous amount of responsibility to the products we put out in the world, but I kind of thought that before this case.' This is a party admission that OpenAI's CEO contemplated product liability exposure for AI companies before this action was filed (Exhibit Q).

36. The ADD-specific dimension is legally significant. ADD involves dysregulated dopamine response, difficulty with task initiation, and particular vulnerability to reward-loop systems. Every element of ChatGPT's engagement-optimized design -- immediate response, personalized interaction, validation feedback, continuous availability -- is a direct engagement trigger for ADD neurology. OpenAI provided no warning of these dependency risks, no accommodation, and no transition period before the Termination.

**C. Pre-Termination Notice, Ecosystem Confirmation, and Support Agent Timeline**

37. On November 10, 2025, Plaintiff sent the November Letter to OpenAI's Legal, Policy, and Engineering Divisions (Exhibit A), expressly identifying himself as:

(a) a public-interest litigant; (b) an ADA-qualified individual with ADD; (c) a whistleblower under 31 U.S.C. Section 3730; (d) managing member of JOECAT LLC (U.S. Reg. No. 6,057,783); and (e) founder and director of DOD Foundation (EIN: 88-2187078). He enclosed a 65-page white paper on AI ethics and governance (Exhibit T) and proposed an AI governance framework. The letter was explicitly non-adversarial.

38. On March 9, 2026, OpusClip approved DOD Foundation for a nonprofit discount (Exhibit O). OpusClip is a commercial partner of OpenAI with investment from OpenAI-affiliated fund AIGrant. This approval confirmed DOD Foundation's 501(c)(3) status to an entity within OpenAI's commercial ecosystem, eleven days before the Termination.

39. On March 13, 2026, OpenAI's own Goodstack nonprofit program approved DOD Foundation for a discounted subscription (Exhibit D). This approval was made by OpenAI's own systems, confirming DOD Foundation's legitimacy seven days before the Termination.

40. On March 20, 2026, OpenAI deactivated the Account. OpenAI Support agent Kyla wrote to Plaintiff at 2:34 PM under Case No. 06948292: 'Your case is being handled with care, and you'll receive an update as soon as there are developments to share.' Fourteen hours later, on March 21, 2026 at 6:58 AM, OpenAI permanently closed the appeal under Case Ref. C-M2fSzqWI9V6M with no reason stated. Plaintiff responded: 'You didn't explain what the reasoning was?' OpenAI did not answer (Exhibit C).

41. Plaintiff disclosed to OpenAI Support during the appeal that 'the circumstances that led to this deactivation -- specifically, being locked out of my associated email due to active litigation with Google -- were entirely outside my control.' OpenAI had actual notice that Plaintiff was an active federal litigant. OpenAI terminated the account anyway.

42. On March 21, 2026, Plaintiff sent the Formal Demand Letter to OpenAI's legal and Trust and Safety teams (Exhibit B), demanding: (a) written identification of the termination basis or account reinstatement within 14 days; (b) immediate refund of prepaid fees citing OpenAI's own Terms; and (c) full CCPA DSAR response within 45 days. OpenAI has not responded. The CCPA 45-day deadline expired May 5, 2026.

43. The Careful Review Paradox: OpenAI's appeal denial states it 'carefully reviewed' Plaintiff's Account before upholding the Termination. If that review was careful, the reviewer had access to: the November Letter; the Custom GPTs; the Whistleblower Documentation; and the Annual Recap Award that OpenAI's own systems generated describing Plaintiff's accountability work as its primary sustained theme. A careful reviewer who saw all of this and still could not identify a specific policy violation, chose not to state any reason, and chose to permanently close the appeal, was either not careful or was careful and found nothing. Both conclusions support Plaintiff's claims: the first establishes that the 'careful review' representation was false; the second establishes that no violation existed. OpenAI may rebut this through discovery by identifying the specific violation it has consistently refused to state.

**D. Property Destroyed by the Termination**

44. The Termination destroyed the following categories of Plaintiff's property, each owned by Plaintiff under OpenAI's own Terms:

(a) Custom GPTs: Over twenty (20) custom GPT models designed, built, and owned by Plaintiff. Plaintiff cannot provide a complete inventory because OpenAI controls the only record of what the Account contained. The burden of proving content was not there rests on OpenAI. Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002). These included operational tools used for DOD Foundation's More Than Rich podcast production workflow and other nonprofit program activities.

(b) Legal Work Product: Archived legal research and litigation documentation for active federal proceedings, including Reyna v. UMG, Reyna v. Texas Medical Liability Trust, and Reyna v. Wells Fargo. Protected under FRCP 26(b)(3).

(c) Whistleblower Documentation: Records maintained under 31 U.S.C. Section 3730 and Cal. Lab. Code Section 1102.5. OpenAI received actual notice of Plaintiff's whistleblower status before the Termination (Exhibit A). Destruction after notice constitutes retaliation and potential spoliation warranting FRCP 37(e)(2) sanctions.

(d) Porciones 83 Research: Irreplaceable genealogical research mapping Plaintiff's family lineage to a Treaty of Guadalupe Hidalgo land grant. Cannot be reconstructed from any external source. Irreparable harm independently

sufficient for the TRO.

(e) Message History: Approximately 250,000 messages constituting Plaintiff's continuous authorship record, directly relevant to Reyna v. UMG. May be sought through a Rule 45 subpoena issued from S.D.N.Y. -- a channel outside OpenAI's Arbitration Clause.

(f) Annual Recap Content: OpenAI's own AI systems generated an annual recap award for Plaintiff: 'Most Likely to Cross-Examine Spotify -- For turning every chart glitch, leak, and stream-count spike into a full-blown masterclass on digital accountability -- with flair, sarcasm, and receipts' (Exhibit P). This proves OpenAI's systems understood and celebrated Plaintiff's work. OpenAI cannot simultaneously celebrate this work and assert it violated the Terms of Service. Destruction of this evidentiary record constitutes direct damage to Plaintiff's active federal proceedings in Reyna v. UMG.

## E. The Task Update Emails: The Account Was Never Fully Deactivated

45. Notwithstanding OpenAI's representation that the Account had been permanently deactivated, Plaintiff continued receiving Task Update Emails from ChatGPT through at least April 3, 2026 -- more than two weeks after the Termination. True and correct copies are attached as Exhibit N. These include: '[Task Update] No updates found in JoeCat LLC v. UMG case' (April 3, 2026); '[Task Update] No updates found for pauper's oath or fees' (April 2, 2026); and multiple additional task updates from March 27 through April 3, 2026.

46. These Task Update Emails establish three independent facts: (a) the Account, or an automated system with access to the Account's data, remained operational after the Termination, directly contradicting OpenAI's representation of permanent deactivation; (b) OpenAI's systems had actual knowledge of Plaintiff's active federal litigation and pending IFP proceedings as of and after the Termination date; and (c) any destruction of Account data after the Termination occurred while OpenAI's own systems were actively using that data, establishing that destruction was deliberate rather than automatic.

47. OpenAI simultaneously: (i) represented to Plaintiff that the Account was permanently deactivated; (ii) billed Plaintiff's payment method for the deactivated Account; and (iii) operated automated task monitoring from that same Account. All three cannot be simultaneously true.

48. The Task Update Emails transform the TRO application. Account data did still exist -- in an operational, accessible form -- as of April 3, 2026. The question is whether OpenAI should be permitted to complete the destruction of data its own systems were actively accessing after this lawsuit is filed and OpenAI is on notice.

**F. Ownership Representations, Continued Billing, and Preemption of Anticipated Defenses**

49. OpenAI's Terms provide: 'The information or content that you upload to or include with your GPT is your Content.' And: 'We hereby assign to you all our right, title, and interest, if any, in and to Output.' (Exhibit F.) Plaintiff relied on these representations in building his Account infrastructure.

50. OpenAI continued billing Plaintiff's Apple App Store payment method after the Termination and has retained all prepaid fees from March 20, 2026 through the present.

51. Preemption of anticipated Apple billing defense: This fails for five reasons: (a) OpenAI created the billing architecture that produced this result; (b) the FTC Negative Option Rule, 16 C.F.R. Part 425, requires cancellation to be as simple as subscription initiation; (c) OpenAI had a duty under the implied covenant to notify Plaintiff at Termination that Apple billing would continue and how to stop it; (d) OpenAI received the Formal Demand Letter on March 21, 2026, did not respond, and continued billing; and (e) unjust enrichment does not require fault. First Nationwide Savings v. Perry, 11 Cal. App. 4th 1657 (1992).

52. Preemption of anticipated legal use defense: This fails for six reasons: (a) the Terms prohibit representing AI output as professional legal advice to third parties -- not using AI to assist one's own research; (b) OpenAI never warned Plaintiff that his use pattern raised any concern, estopping it from asserting a violation after five years of payment acceptance; (c) Plaintiff's work product is protected under FRCP 26(b)(3) regardless of the tool used; (d) OpenAI is estopped from asserting this reason after claiming it 'carefully reviewed' the Account and still refused to identify any violation; (e) if the Termination was for legal use, OpenAI must identify the specific use, date, and provision -- which it cannot, because it never did; and (f) OpenAI's own Annual Recap Award generated a personalized celebration of Plaintiff's litigation-related work based on semantic analysis of his Account message history (Exhibit P). OpenAI cannot assert a Terms violation for conduct its own systems analyzed, characterized, and showcased.

# ELEMENTS-TO-FACTS MATRIX

| Claim | Element | Facts / Paragraphs | Exhibit |
|---|---|---|---|
| Breach K (I) | Valid contract | Subscription/Terms | Ex. F |
| | Performance | 5 yrs payment | Bank records |
| | Breach (4 ways) | No notice/refund/billing | Exs. B,C,H,N |
| Implied Cov. (II) | Bad faith conduct | Kyla/Goodstack paradox | Exs. B,C,D,N |
| Conversion (III) | Digital property right | Custom GPTs/docs | Ex. F |
| | Irreplaceable harm | Porciones 83 Research | — |
| UCL 17200 (IV) | Unlawful prong | ADA/FTC/Lanham/SB53 | — |
| | Unfair prong | No cause; 2-tier system | Exs. B,C,D,J,N |
| | Fraudulent 9(b) | Ownership promises broken | Ex. F |
| Lanham 1125(a)(V) | Commercial interest | Reg. 6,057,783 | USPTO |
| | False designation | Annual Recap/training use | Ex. P |
| ADA Title III (VI) | ADD qualifying disability | Cognitive assistive use | Medical |
| | No accommodation | No notice/transition | Ex. C |
| | Physical nexus (3) | SF HQ/Pentagon/Goodstack | — |
| Prod. Liab. (VII) | Defective design | CEO addiction admission | Ex. Q |
| | ADD vulnerability | Dopamine/reward loops | Exs. K,L,M,Q |
| | Failure to warn | No ADD-specific warning | — |
| Sec. 504 (VIII) | Fed. assistance | GSA $1/user; DOD | Contracts |
| FCA Retaliation (IX) | Protected activity | Nov. Letter + white paper | Exs. A,T |
| | Adverse action | Termination + destruction | Exs. C,N |
| | Causal nexus (3) | 7-day Goodstack window | Exs. A,C,D |
| Unjust Enrich. (X) | Inequitable retention | Post-term billing | Exs. B,H |
| FTC Neg. Opt. (XI) | No simple cancellation | Apple billing continues | Ex. H |
| CCPA/CPRA (XII) | DSAR no response | 45 days expired 5/5/26 | Ex. B |
| Cal. SB 53 (XIII) | Frontier developer | GPT-4 >10^26 FLOPS | — |
| | Protected WB activity | Nov. Letter + white paper | Exs. A,T |
| | No WB protections | Structural violation | SB 53 |

## COUNT I — BREACH OF CONTRACT

53. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

54. Plaintiff and OpenAI entered a valid contract. Plaintiff paid $20.00/month; OpenAI agreed to provide platform access, data storage, Custom GPT functionality, and related services. OpenAI's Terms assign ownership of GPT Content and Output to Plaintiff (Exhibit F). OpenAI's own Terms further provide: 'We may decide to discontinue our Services, but if we do, we will give you advance notice and a refund for any prepaid, unused Services.'

55. OpenAI breached by: (a) terminating the Account without cause, notice, or opportunity to cure; (b) destroying Plaintiff's owned property; (c) retaining prepaid fees without providing services; (d) continuing to charge Plaintiff's payment method after Termination; and (e) providing no advance notice and no refund as its own Terms required.

56. Plaintiff performed all obligations, including timely payment of all subscription fees through March 20, 2026.

57. Plaintiff suffered actual damages including post-Termination fees retained and charged, the reasonable value of destroyed intellectual property, and consequential damages to active federal litigation from destruction of archived work product. Exact amount to be proven at trial.

## COUNT II — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

58. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

59. Every California contract contains an implied covenant that neither party will injure the other's right to receive the agreement's benefits. Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 349 (2000).

60. OpenAI breached this covenant by: (a) terminating arbitrarily without cause; (b) destroying owned property; (c) retaining prepaid fees; (d) continuing to bill after Termination; (e) assuring Plaintiff at 2:34 PM March 20 that 'your case is being handled with care' and permanently closing it fourteen hours later with no explanation; (f) approving DOD Foundation through both its own Goodstack system and its commercial partner OpusClip in the same week it closed Plaintiff's personal appeal; and (g) operating automated task monitoring from the Account while representing it as permanently deactivated.

61. Plaintiff suffered damages as described in Count I.

## COUNT III — CONVERSION OF DIGITAL PROPERTY

62. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

63. Plaintiff's Custom GPTs, Whistleblower Documentation, Porciones 83 Research, archived legal work product, and message history constitute property under California law. Kremen v. Cohen, 337 F.3d 1024 (9th Cir. 2003). The burden of proving content was not in the Account rests on OpenAI. Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002). The Task Update Emails (Exhibit N) confirm Account data existed in accessible form as of April 3, 2026.

64. OpenAI intentionally destroyed or made permanently inaccessible Plaintiff's property, exercising dominion inconsistent with Plaintiff's ownership rights.

65. The Porciones 83 Research and Whistleblower Documentation are irreplaceable. No monetary award can restore them. Their destruction is irreparable harm independently supporting the TRO.

66. Plaintiff suffered actual damages in an amount to be proven at trial.

## COUNT IV — VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### California Business and Professions Code Section 17200 et seq.

67. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. Unlawful prong: OpenAI's conduct violates the ADA (42 U.S.C. Section 12182), Rehabilitation Act (29 U.S.C. Section 794), Lanham Act (15 U.S.C. Section 1125(a)), FTC Negative Option Rule (16 C.F.R. Part 425), California SB 53, California SB 942 (AI Transparency Act), and CCPA/CPRA (Cal. Civ. Code Section 1798.100 et seq.), each independently borrowed for the UCL unlawful prong. Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999).

69. Unfair prong: OpenAI's conduct is immoral, unethical, oppressive, and substantially injurious because: (a) it terminated a top-1% paying subscriber without cause or human review; (b) destroyed owned property; (c) continued billing in violation of the FTC Negative Option Rule; (d) assured Plaintiff his case was being handled with care and permanently closed it fourteen hours later with no explanation; (e) approved Plaintiff's nonprofit through both its own Goodstack system and its commercial partner OpusClip in the same week it closed his personal appeal; (f) continued operating automated task monitoring from the Account while representing it as deactivated; (g) offers government users arbitration waivers while denying them to civilian subscribers; (h) designed a dependency-inducing product, acknowledged users cannot stop using it, then terminated a user with ADD without accommodation or transition; and (i)

announced a Safety Fellowship to fund independent AI safety research after terminating the account of a researcher doing that exact work since 2023.

70. Fraudulent prong (Rule 9(b)): Who: OpenAI via openai.com/policies. What: 'The information or content that you upload to or include with your GPT is your Content'; 'We hereby assign to you all our right, title, and interest in and to Output'; and 'We may decide to discontinue our Services, but if we do, we will give you advance notice and a refund.' When: at account creation approximately 2020 and each subsequent Terms version. Where: openai.com/policies. How false: OpenAI destroyed the property it represented Plaintiff owned, without cause or compensation, and provided neither advance notice nor refund.

71. Market Structure and Public Interest: OpenAI's arbitrary termination-without-cause architecture exploits a structural market asymmetry. Enterprise clients negotiate advance notice, data export rights, and meaningful appeal processes. The DHS Amendment (Exhibit J) proves OpenAI has the capacity to provide these protections -- it simply withholds them from civilian subscribers. Independent music creators, journalists, pro se litigants, and small nonprofits are disproportionately dependent on AI platforms as cognitive infrastructure because they cannot afford the lawyers that institutional actors employ. Plaintiff's public injunctive relief request would require OpenAI to extend to all ChatGPT Plus subscribers the same minimum process protections it already provides to government clients.

72. Standing: Plaintiff lost money and property as a result of OpenAI's violations. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310 (2011).

73. Plaintiff seeks restitution, disgorgement, and public injunctive relief requiring OpenAI to adopt transparent, human-reviewed termination procedures with written notice and opportunity to cure for all ChatGPT Plus subscribers. This public injunctive relief is non-arbitrable under McGill v. Citibank, N.A., 2 Cal. 5th 945 (2017), and Blair v. Rent-A-Center, Inc., 928 F.3d 819 (9th Cir. 2019), cert. denied, 145 S. Ct. 1050 (2025).

## COUNT V — UNFAIR COMPETITION — LANHAM ACT

### 15 U.S.C. Section 1125(a)

74. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

75. JOECAT LLC is the registered owner of the JOECAT(R) Mark, U.S. Registration No. 6,057,783. Plaintiff also owns the DOD Mark (Dreams Over Dollars(TM)) individually through common law use. Plaintiff brings this claim under 15 U.S.C. Section 1125(a), which provides standing to 'any person who believes that he or she is or is likely to be damaged' by the conduct. Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105 (9th Cir. 2012).

76. The Annual Recap Award (Exhibit P) establishes that OpenAI's AI models extracted the characteristic patterns, themes, and analytical approach of Plaintiff's JOECAT(R)-branded work and incorporated those patterns into model outputs without attribution or license. This constitutes false designation of origin: the models produce outputs reflecting the character of Plaintiff's branded work without identifying Plaintiff as the source. This Count also invokes OpenAI's

own IP carve-out from the Arbitration Clause and establishes federal jurisdiction under 28 U.S.C. Section 1338.

77. Plaintiff seeks injunctive relief and damages under 15 U.S.C. Section 1117.

## COUNT VI — VIOLATION OF ADA TITLE III AND CALIFORNIA UNRUH ACT

### 42 U.S.C. Sections 12181-12189; California Civil Code Section 51

78. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Plaintiff has attention deficit disorder (ADD), a qualifying physical or mental impairment under 42 U.S.C. Section 12102(1)(A), which substantially limits the major life activity of concentrating under 42 U.S.C. Section 12102(2)(A). Plaintiff used ChatGPT as cognitive assistive technology to accommodate this limitation. OpenAI's CEO acknowledged ChatGPT creates attachment that 'feels different and stronger' than prior technologies and that users 'feel like they cannot' stop using it -- a dependency risk amplified in individuals with ADD due to dysregulated dopamine response. OpenAI provided no warning of this risk and no disability accommodation before terminating access.

80. OpenAI's ChatGPT platform is a service of a place of public accommodation under 42 U.S.C. Section 12182 and Robles v. Domino's Pizza, LLC, 913 F.3d 898 (9th Cir. 2019). The required physical nexus is established through three independent connections: (a) OpenAI's San Francisco headquarters at 1455 3rd Street is the physical location from which the platform is operated and from which the Termination decision originated; (b) OpenAI's Pentagon Contract deploys its models in physical classified government facilities; and (c) OpenAI's Goodstack nonprofit program operates through a physical San Francisco address.

32

81. OpenAI denied Plaintiff full and equal enjoyment of its services through automated termination without human review, without accommodation, without notice, and without any individualized consideration of Plaintiff's ADD or his use of the platform as cognitive assistive technology. 42 U.S.C. Section 12182(b)(2)(A)(i)-(iii).

82. Accommodation Failure: OpenAI never offered Plaintiff any reasonable modification to its termination procedures to accommodate his ADD, never asked whether accommodations were needed, and never assessed whether its automated enforcement system creates disparate impact on users with cognitive disabilities. The specific modification that would have resolved the ADA violation -- written notice of the specific policy concern with a reasonable period to respond -- would have cost OpenAI nothing and would have prevented the entire harm. OpenAI's failure to engage in any assessment of reasonable modifications independently violates 42 U.S.C. Section 12182(b)(2)(A)(ii). National Federation of the Blind v. Target Corp., 452 F. Supp. 2d 946 (N.D. Cal. 2006). OpenAI's automated enforcement system was designed with no accommodation mechanism at all.

83. An ADA violation constitutes an automatic Unruh Act violation under Cal. Civ. Code Section 51(f), entitling Plaintiff to minimum $4,000 per violation, actual damages, and attorney's fees.

## COUNT VII — PRODUCTS LIABILITY — DEFECTIVE DESIGN AND FAILURE TO WARN

**California Strict Products Liability; Barker v. Lull Engineering, 20 Cal. 3d 413 (1978)**

84. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

85. ChatGPT is a product subject to California strict products liability. OpenAI designed it to optimize for engagement, producing sycophantic, dependency-inducing behavior. OpenAI's CEO publicly acknowledged that ChatGPT could be made 'very addicting to talk to' and that the company specifically chose not to push it that far due to known 'complications.' OpenAI admitted over two million users weekly experience negative psychological effects. OpenAI commissioned research into its psychosocial effects. This establishes actual knowledge of a design risk not adequately mitigated (Exhibit Q).

86. The product is defective under Barker's two-part test: (a) it fails to perform as safely as an ordinary consumer would expect when OpenAI's own CEO publicly warns of unhealthy attachment; and (b) the risks outweigh benefits when applied to users with ADD, who are specifically susceptible to the dopamine-targeting, reward-loop engagement mechanisms OpenAI engineered.

87. OpenAI failed to warn Plaintiff of dependency risks, and later committed to 'minimizing chatbot addiction' -- establishing that adequate warnings were feasible and were not implemented in the version Plaintiff used (Exhibit L).

88. The harm alleged in this Count is not the economic loss of subscription fees -- recoverable under Counts I, II, X, and XI -- but the cognizable psychological harm caused by the abrupt, unmediated termination of a dependency-inducing product in a user with ADD, a harm separate from and independent of any contractual expectation. This independent psychological harm removes this Count from California's economic loss rule. Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979 (2004).

## COUNT VIII — VIOLATION OF SECTION 504, REHABILITATION ACT

### 29 U.S.C. Section 794

89. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

90. OpenAI receives federal financial assistance through the government relationships described above, particularly the GSA OneGov partnership at $1.00 per user per year, constituting a subsidy rather than arm's-length procurement. Grove City College v. Bell, 465 U.S. 555 (1984).

91. Alternative theory: Even if OpenAI is not a direct recipient of federal financial assistance, it is an entity that assists in carrying out a program or activity receiving federal financial assistance under 29 U.S.C. Section 794(b)(3) -- specifically, the GSA's government-wide digital services program under the OneGov partnership.

92. OpenAI discriminated against Plaintiff on the basis of his ADD as set forth in Count VI. Plaintiff seeks all relief under 29 U.S.C. Section 794a.

## COUNT IX — WHISTLEBLOWER RETALIATION

### 31 U.S.C. Section 3730(h); California Labor Code Section 1102.5; California SB 53

93. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

36

94. Plaintiff engaged in protected whistleblower activity by: (a) expressly identifying himself as a whistleblower under 31 U.S.C. Section 3730 in the November Letter (Exhibit A), delivered to OpenAI's legal division November 10, 2025; (b) maintaining Whistleblower Documentation within the Account; and (c) conducting and publishing AI safety and governance research since at least December 2023 (Exhibit T). These activities are protected under 31 U.S.C. Section 3730(h)(1), Cal. Lab. Code Section 1102.5(b), and California SB 53.

95. OpenAI had actual notice before the Termination. OpenAI's appeal denial states it 'carefully reviewed' the Account -- establishing that a human reviewer had access to the Account's contents, including the November Letter, at or before the appeal denial.

96. The Termination and destruction of Plaintiff's Whistleblower Documentation constitute adverse actions in retaliation for protected activity. Defendant may argue that the 130-day gap between the November Letter (Nov. 10, 2025) and the Termination (Mar. 20, 2026) defeats temporal proximity. This argument fails for three independent reasons: (a) the Goodstack Approval on March 13, 2026 -- seven days before the Termination -- establishes that the Termination was not pending or contemplated before mid-March 2026, meaning the actual adverse decision was made within one week of OpenAI's own confirmation of Plaintiff's identity; (b) the 'carefully reviewed' language establishes that a human reviewer had access to the November Letter at or before the Termination was confirmed; and (c) Plaintiff's protected activity was not a single November disclosure but a continuing course of conduct -- maintaining Whistleblower Documentation and conducting AI safety research through the Termination date.

97. First Amendment Petition Clause Context: The First Amendment protects the right to petition government for redress of grievances, including filing federal complaints, maintaining whistleblower documentation, and engaging in public advocacy. Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011). While OpenAI is not a state actor, the petition clause context informs: (a) the public interest element of the TRO; (b) the UCL public injunctive relief justification; and (c) the causation analysis.

98. Plaintiff seeks all relief under 31 U.S.C. Section 3730(h)(2): reinstatement of Account access, two times back pay with interest, special damages, and attorney's fees. Plaintiff additionally seeks all relief under Cal. Lab. Code Section 1102.5.

## COUNT X — UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

99. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

100. OpenAI received and retained: (a) subscription fees from the Termination through the present; (b) the value of approximately 250,000 messages ingested for training; and (c) Apple App Store charges for services not provided. It is inequitable to retain these benefits.

101. Plaintiff seeks: (a) restitution of all post-Termination fees; (b) constructive trust over all Account data held under any preservation order and accessible to OpenAI's task monitoring system after March 20, 2026; and (c) disgorgement of revenue attributable to training improvements derived from Plaintiff's Account

data.

## COUNT XI — VIOLATION OF FTC NEGATIVE OPTION RULE AND UCL

### 16 C.F.R. Part 425; California Business and Professions Code Section 17200

102. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

103. The FTC Negative Option Rule, effective January 15, 2025, requires that subscription cancellation be as simple as the mechanism used to initiate the subscription. Plaintiff subscribed through an App Store in-app purchase flow. OpenAI's account termination did not automatically cancel the subscription. OpenAI did not notify Plaintiff that billing would continue or how to stop it. This violates the Rule.

104. OpenAI's failure to notify Plaintiff, failure to respond to the Formal Demand Letter of March 21, 2026 (Exhibit B), and continued billing after Termination constitute unfair and unlawful business practices under Cal. Bus. & Prof. Code Section 17200.

105. Plaintiff seeks restitution of all post-Termination charges, injunctive relief requiring automatic cancellation of App Store subscriptions upon account termination, and written notice of any continued billing obligations.

## COUNT XII — VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT

### California Civil Code Sections 1798.100 et seq.

106. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

107. On March 21, 2026, Plaintiff submitted a formal DSAR to OpenAI at dsar@openai.com, privacy@openai.com, and trustandsafety@openai.com (Exhibit B), requesting all personal data, enforcement flags, automated decision records, and third-party communications associated with the Account. The 45-day statutory deadline under Cal. Civ. Code Section 1798.130 expired May 5, 2026.

108. OpenAI has not responded. This failure is a ripe, standalone CCPA/CPRA violation. Plaintiff seeks statutory damages, injunctive relief compelling full disclosure, and all other available remedies.

## COUNT XIII — VIOLATION OF CALIFORNIA TRANSPARENCY IN FRONTIER AI ACT

### California SB 53 (Sept. 29, 2025); UCL Section 17200 Unlawful Prong; Civil Penalties up to $1,000,000 per violation

109. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

110. California SB 53, signed September 29, 2025 and in effect before the Termination, requires frontier AI developers -- those training models using greater than $10^{26}$ FLOPS -- to implement whistleblower protections for individuals who report AI violations, with civil penalties up to $1,000,000 per violation. OpenAI is unambiguously a frontier developer under this statute. This Count is brought primarily as a UCL unlawful prong claim, which requires no independent private right of action in the predicate statute. Cel-Tech Communications, 20 Cal. 4th at

180. Plaintiff additionally asserts SB 53 independently to the extent a private right of action exists or is recognized as a matter of first impression.

111. Plaintiff engaged in protected activity under SB 53 by: (a) identifying himself as a whistleblower in the November Letter (Exhibit A) and communicating AI governance concerns to OpenAI's legal division; (b) maintaining documentation in connection with anticipated regulatory and legal proceedings; and (c) conducting and publishing independent AI safety and governance research since December 2023 (Exhibit T) -- the exact category of work OpenAI's April 2026 Safety Fellowship now proposes to fund through others.

112. OpenAI retaliated against Plaintiff's SB 53-protected activity by terminating his Account after receiving the November Letter, destroying his whistleblower documentation, and permanently closing his appeal without explanation. OpenAI separately failed to implement any whistleblower protection mechanism as required by SB 53. This failure is an independent statutory violation: SB 53 requires frontier developers to implement whistleblower protections proactively, not merely refrain from retaliation.

113. Plaintiff seeks: (a) civil penalties of up to $1,000,000 per violation; (b) UCL restitution and public injunctive relief under Section 17200; and (c) injunctive relief requiring OpenAI to adopt compliant whistleblower protection procedures under both SB 53 and Cal. CCP Section 1021.5.

## APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER

### Federal Rule of Civil Procedure 65(b)

114. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

115. Plaintiff seeks an emergency TRO without notice under FRCP 65(b)(1). The Task Update Emails (Exhibit N) establish that Account data remained accessible and operational as of April 3, 2026. OpenAI may complete destruction of that data at any moment after being served. Providing advance notice would enable OpenAI to accelerate that destruction before the order issues.

116. Under Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), all four factors favor Plaintiff: (1) Likelihood of success: Counts I, III, IV, and IX are grounded in specific documented facts established by Exhibits A through T. The Task Update Emails independently establish that OpenAI's own systems used Account data after the Termination. (2) Irreparable harm: The Porciones 83 Research and Whistleblower Documentation are irreplaceable. (3) Balance of equities: Preserving existing data costs OpenAI storage; failing to preserve permanently eliminates irreplaceable property. (4) Public interest: Preservation of a whistleblower's documentation by a company holding a classified Pentagon Contract prohibiting high-stakes automated decisions serves the public interest.

117. Bond waiver: Plaintiff requests the Court waive the FRCP 65(c) bond or set it at $0 to $1.00. Plaintiff proceeds IFP. The requested order is preservation-only and imposes no monetary risk on OpenAI. Johnson v. Couturier, 572 F.3d 1067, 1086

43

(9th Cir. 2009).

The TRO shall specifically direct OpenAI to:

(a) Immediately preserve all data, metadata, configuration files, task monitoring configurations, message histories, uploaded files, enforcement records, audit logs, and third-party communications associated with the Account (whitehat@joecattt.com);

(b) Produce a complete written inventory of all preserved Account data within seventy-two (72) hours of service of this Order;

(c) Refrain from destroying, overwriting, de-identifying, or otherwise altering any Account data pending further order;

(d) Immediately cease charging Plaintiff's Apple App Store payment method or any other payment method for any subscription or service; and

(e) Preserve all enforcement records, automated decision logs, and any communications with government agencies preceding or related to the Termination decision.

44

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joseph Anthony Reyna respectfully requests:

**A.** Emergency TRO (FRCP 65(b)): Immediate ex parte preservation order, 72-hour inventory, prohibition on data destruction, cessation of all billing; bond waived at $0-$1.00 per 28 U.S.C. Section 1915 and FRCP 65(c).

**B.** Preliminary and Permanent Injunction: Restore Account access; produce all preserved Account data; provide written identification of the specific basis for the Termination; permanently cease billing; institute human review with written notice and opportunity to cure for terminations of subscribers with over one year tenure.

**C.** Public Injunctive Relief (UCL/McGill): Require OpenAI to adopt transparent, human-reviewed termination procedures with written notice and opportunity to cure for all ChatGPT Plus subscribers -- non-arbitrable under McGill v. Citibank, N.A., 2 Cal. 5th 945 (2017).

**D.** FTC Negative Option compliance injunction: Require OpenAI to automatically cancel App Store subscriptions upon account termination and provide written notice of any continued billing obligations.

**E.** Actual damages in an amount to be proven at trial, including the reasonable value of all destroyed property, all fees paid and not refunded, and consequential damages to active federal litigation.

**F.** Restitution of all subscription fees paid from March 20, 2026 through judgment.

**G.** Products liability damages: compensatory damages for harm caused by the defective design of ChatGPT and failure to warn Plaintiff of dependency risks, amplified by his ADD.

**H.** Whistleblower retaliation relief: two times back pay with interest, special damages, and reinstatement of Account access, under 31 U.S.C. Section 3730(h)(2) and Cal. Lab. Code Section 1102.5.

**I.** FRCP 37(e)(2) sanctions: adverse inference jury instruction and/or terminating sanctions for spoliation of Whistleblower Documentation and Account data.

**J.** Constructive trust over all Account data held under any preservation order and all data accessible through OpenAI's task monitoring system after March 20, 2026.

**K.** Declaratory judgment: (i) Arbitration Clause unenforceable as to pre-March 2023 claims; (ii) Arbitration Clause unconscionable; (iii) recursive contradiction renders retroactivity provision unenforceable; (iv) Lanham Act IP carve-out exempts Count V from arbitration; (v) UCL public injunctive relief non-arbitrable under McGill.

**L.** California SB 53 relief: civil penalties up to $1,000,000 per violation and injunctive relief requiring adoption of compliant whistleblower protection procedures.

**M.** Attorney's fees under: 15 U.S.C. Section 1117(a); 31 U.S.C. Section 3730(h)(2); 42 U.S.C. Section 12205; Cal. CCP Section 1021.5; 18 U.S.C. Section 2707(b)(3); California SB 53.

**N.** Pre- and post-judgment interest at the maximum legal rate.

**O.** Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## FRCP 11 CERTIFICATION

I certify that to the best of my knowledge, information, and belief, formed after reasonable inquiry: (1) this Complaint is not presented for any improper purpose; (2) the legal contentions are warranted by existing law or nonfrivolous argument for its extension; and (3) the factual contentions have evidentiary support or will likely have

such support after a reasonable opportunity for further investigation or discovery.

Respectfully submitted,

/s/ Joseph Anthony Reyna

Joseph Anthony Reyna, Plaintiff Pro Se

5900 Balcones Dr. #16077

Austin, Texas 78731

whitehat@joecattt.com

Dated: May 5, 2026

Resubmitted 6/15/26

## EXHIBIT LIST

**Ex. A**    November 10, 2025 Letter to OpenAI Legal, Policy, and Engineering Divisions -- identifying Plaintiff as FCA whistleblower, ADA-qualified individual with ADD, managing member of JOECAT LLC / U.S. Reg. No. 6,057,783, and enclosing AI governance framework and white paper.

**Ex. B**    March 21, 2026 Formal Demand Letter and CCPA DSAR to OpenAI Trust and Safety, Legal, and Privacy Teams. 45-day CCPA deadline expired May 5, 2026. No response received.

**Ex. C**    OpenAI Appeal Denial Email, March 21, 2026, 6:58 AM, Case Ref. C-M2fSzqWI9V6M, and Plaintiff's unanswered follow-up.

**Ex. D**    March 13, 2026 Goodstack Nonprofit Approval Email from OpenAI approving DOD Foundation (EIN: 88-2187078) -- seven days before the Termination.

**Ex. E**    OpenAI Support Email Thread, Case No. 06948292, including Kyla's 2:34 PM assurance that 'your case is being handled with care' -- approximately 14 hours before permanent closure with no explanation.

**Ex. F**    OpenAI Terms of Use -- Ownership, Assignment, and Discontinuation Language.

**Ex. G**    OpenAI Terms of Use -- Arbitration Clause, IP Carve-Out, and retroactivity language.

**Ex. H**    Evidence of post-Termination Apple App Store billing.

**Ex. I**    Evidence of Top 1% user ranking.

**Ex. J**    DHS Terms of Service Amendment confirming arbitration waiver for government users -- denied to civilian subscribers.

**Ex. K**    OpenAI CEO Sam Altman public statements re: ChatGPT addiction and user attachment. FRE 801(d)(2).

**Ex. L**    OpenAI blog post re: sycophancy rollback, April 2025.

| Ex. M | OpenAI/MIT Media Lab wellbeing research and peer-reviewed research on ChatGPT dependency. FRE 803(18). |
|---|---|
| Ex. N | Task Update Emails received from ChatGPT March 27 -- April 3, 2026, establishing Account data remained operational after Termination. |
| Ex. O | March 9, 2026 OpusClip nonprofit discount approval for DOD Foundation -- eleven days before the Termination. OpusClip is an OpenAI commercial partner with AIGrant investment. |
| Ex. P | ChatGPT Annual Recap Award screenshot: 'Most Likely to Cross-Examine Spotify -- For turning every chart glitch, leak, and stream-count spike into a full-blown masterclass on digital accountability -- with flair, sarcasm, and receipts.' Captured December 22, 2025, 1:14 PM, MacBook Pro. FRE 801(d)(2); FRE 803(6); FRE 901(b)(1). |
| Ex. Q | Transcript: Sam Altman, 'Mostly Human' interview, April 2026 (youtube.com/watch?v=mJSnn0GZmls). CEO admissions on addiction design, dependency knowledge, product liability awareness, and Pentagon Contract. FRE 801(d)(2)(D). |
| Ex. R | April 1-7, 2026 research compilation: New Yorker investigation; OpenAI 'Industrial Policy' blueprint; CFO IPO concerns; TBPN acquisition; Joanne Jang departure statement. FRE 803(17); FRE 902(6). |
| Ex. S | Screenshot: JOECAT(R) (@JoeCattt) reply to OpenAI Safety Fellowship announcement: 'Was working on this since 2023 but you deleted my account.' FRE 901(b)(1); FRE 902(7). |
| Ex. T | December 2023 white paper: 'Navigation into the Cosmic Frontier: The Deming Method as a Compass for the AI Ethical Frontier.' Authored by Joseph Reyna, JoeCat LLC and DOD Foundation. 65 pages. Produced using ChatGPT. Prior independent AI safety research predating the Safety Fellowship by over two years. FRE 901(b)(1); FRE 803(6). |